## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JENNA D. WILLIAMS, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | )   CASE NO. 05-CV-661-FHM |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| DEFENDANT. | ) |

## ORDER

Plaintiff, Jenna D. Williams, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017 (10th Cir. 1996); *Castellano v. Secretary of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as

---

[1] Plaintiff's November 20, 2002 application for disability insurance benefits was denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held March 18, 2004; a supplemental hearing was held May 19, 2004 . By decision dated August 27, 2004, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the ALJ's decision on September 23, 2005. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir. 2003). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).  Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was born August 15, 1982, and was 21 years old at the time of the hearing. [R. 127, 316].  She claims to have been unable to work since July 1, 2001, due to residuals from Chiari malfunction surgery including headaches, pain, leg shakes, weakness, fatigue and medication side effects.[2] [R. 318-327].  The ALJ determined that Plaintiff has a severe impairment consisting of status post posterior fossa decompression for Chiari I malformation. [R. 17].  Despite this impairment, the ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform sedentary exertional work activity. [R.24].  He determined that Plaintiff has no past relevant work (PRW). [R. 24].  The ALJ concluded, based upon the Medical-Vocational Rules (Grids), that Plaintiff is not disabled as defined by the Social Security Act. [R. 25-27].  The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled.  *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

---

[2]  *Stedman's Medical Dictionary*, 27th ed. (2000) defines Chiari malformation as: "malformed posterior fossa structures associated with caudad traction and displacement of the rhombencephalon as caused by tethering of the spinal cord."  Rhombencephalon is part of the developing brain. *Id.*  As described on the website of the National Institute of Neurological Disorders and Stroke, Chiari Malformations are structural defects in the cerebellum, the part of the brain that controls balance. http://www.ninds.nih.gov/disorders/chiari/chiari.htm (Jan.3, 2007).

Plaintiff asserts the ALJ's decision is not based upon substantial evidence. Specifically, Plaintiff asserts the ALJ: 1) erred by failing to consider the opinion of the treating physician; 2) failed to fully evaluate her allegations of pain; and 3) erred by mechanically applying the Grids. [Plaintiff's Memorandum Brief, Dkt. 20, p. 5].  For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for reconsideration and reassessment of Plaintiff's RFC.

### Arnold-Chiari I Malformation

Arnold-Chiari Malformation Type I ("ACM Type I" or "Chiari I malformation") is a congenital abnormality characterized by the underdevelopment of the bone at the base of the skull (posterior cranial fossa) and overcrowding of the normally developed hindbrain. *See Lawson v. U.S.*, 454 F.Supp.2d 373 (D.Md. 2006) (citing Robert I. Grossman & David M. Yousem, *Neuroradiology: The Requisites* 436 (2003).  As a result of the underdevelopment of the posterior cranial fossa and overcrowding of the hindbrain, individuals with this abnormality have a larger than normal opening at the base of the skull (foramen magnum), which permits the hindbrain/cerebellar tonsils to protrude, or herniate, into the spinal canal. The herniation of the hindbrain happens at birth or shortly thereafter. In its pure form, a Chiari I malformation shows the cerebellar tonsils down to the C1-C2 region, with normal brain stem location.  Chiari I malformation exists in approximately one percent of the population, and most cases are diagnosed by MRI.[3]  Even though individuals are born with Chiari I malformation, those afflicted are generally unaware that they have the condition unless and until symptoms

---

[3]   MRI stands for "Magnetic Resonance Imaging," and is a procedure in which magnetic resonance imaging is used to produce computerized images of internal body tissues.

appear. Chiari I malformation can remain asymptomatic, or it can result in a gradual progression of symptoms over an individual's life. While most Chiari I malformations do not result in any symptomatology and are never detected, some individuals develop headaches in conjunction with the condition. These headaches are typically occipital (at the back of the head) in nature and may be associated with nausea and vomiting. In some instances, age combined with triggering events such as trauma or pregnancy will cause a Chiari I malformation to decompensate. Decompensation produces significant cerebrospinal fluid problems below the cerebellum in the posterior cranial fossa and the spinal cord. Decompensation with an associated syrinx[4] leads to the progressive development of neurological symptomatology related to anatomical functions of posterior fossa brain structures, manifesting as vertigo, ataxia, focal neurological findings and severe headaches. These symptoms are similar and overlapping with symptoms of other intracranial problems, such as brain tumors.  The treatment for decompensated Chiari I malformation with syrinx is neurosurgical and involves decompression flow by performance of a craniectomy at the level of the foramen magnum, producing space to allow normal cerebrospinal fluid flow and reabsorption of syrinx and hydromyelia fluids. A duraplasty is performed to create space around the brain tissues, thereby allowing long-term decompression and promoting flow. Surgical decompression is recommended for patients with a decompensated Chiari I malformation and syrinx, because the presence of the syrinx portends a higher risk for problems. *Id*, at 379 .

---

[4] Syrinx: synonym for fistula; a pathologic tubular cavity in the brain or spinal cord. Stedmans Med. Dict. 27th ed. (2000).

4

## Plaintiff's Medical History

The record reveals that Plaintiff's primary general health care provider, John D. Jennings, M.D., recorded Plaintiff's complaints of daily moderate to severe headaches and significant weight loss on July 17, 2001. [R. 209]. He ordered blood work and an MRI of Plaintiff's brain. [R. 210]. The MRI revealed "at least mild crowding at the foramen magnum level due to borderline low-normal extension of the cerebellar tonsils." [R. 182]. At Dr. Jennings' request, Plaintiff was examined by Steven E. Gaede, M.D., a neurosurgeon at the Oklahoma Spine & Brain Institute, on August 11, 2001. [R. 171-173]. In Dr. Gaede's report to Dr. Jennings, he noted Plaintiff's history of poor balance and intermittent headaches, as well as blackouts and vision changes upon standing during childhood with recent worsening of symptoms. [R. 171]. Physical examination revealed tandem gait only fair, positive Romberg, tending to fall backward, mild diffuse hyperreflexia[5] in the upper extremities, more pronounced in the lower extremities with bilateral unsustained ankle clonus[6] and 3-4+ knee reflexes. [R. 172]. After reviewing the MRI, Dr. Gaede said: "It appears that she has at least 4 mm of cerebellar ectopia."[7] *Id.* Dr. Gaede wrote that Plaintiff's symptoms were significant and he was concerned they will not resolve with medical treatment. [R. 173]. He recommended a "blast of

---

[5] Hyperrefexia is defined as overactive or overresponsive reflexes; e.g. twitching or spastic tendencies; a condition in which the deep tendon reflexes are exaggerated. Stedmans Med. Dict. 27th ed. (2000).

[6] Clonus is a form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession seen with, among other conditions, spasticity and some seizure disorders. Ankle clonus is a rhythmic contraction of the calf muscles following a sudden passive dorsiflexion of the foot, the leg being semiflexed. Stedmans Med. Dict. 27th ed. (2000).

[7] Ectopia is congenital displacement or malposition of any organ or part of the body. Stedmans Med. Dict. 27th ed. (2000).

steroids" to get rid of some edema (swelling). *Id.*  Noting that once Chiari malformation becomes symptomatic, it is unlikely to resolve, he recommended Plaintiff try half-days at work, "since she wants to return, although she may not be able to tolerate those as well." *Id.*

On August 31, 2001, Dr. Gaede again wrote to Dr. Jennings, reporting that he had a very long discussion with Plaintiff and her parents regarding the diagnosis and treatment of Chiari malformation. [R. 169].  He reported that Plaintiff had improved somewhat with the medication but that her headaches were so severe that she was unable to work. [R. 170].  He prescribed a higher dose of the medication and advised considering occipital decompression if there was no additional improvement. [R. 170].  He warned Plaintiff and her parents that surgical decompression often does not give complete relief of symptoms, and sometimes no relief at all. *Id.*

On September 7, 2001, Dr. Gaede reported to Dr. Jennings that he had explained to Plaintiff that "intense personalities (such as hers) often do not get the kind of intensely perfect result they are looking for from decompression, although the surgery is quite effective for decompressing the tonsils and relieving objective neurological symptoms."[8]  [R. 167].  He was informed by Plaintiff that she planned to see a "pain physician" and he warned against "manipulative therapy." *Id.*  He was told he would be contacted if the pain treatment was ineffective. *Id.*

On October 3, 2001, Plaintiff asked Dr. Jennings for a referral to a neurologist for a second opinion. [R. 206].  She was seen by Benjamin G. Benner, M.D., on

---

[8]  Plaintiff has a history of Obsessive Compulsive Disorder. [R. 170, 209].

6

October 18, 2001, who reported to Dr. Jennings that he had recently been referred quite a number of patients for Arnold-Chiari malformation "as it seems to be a very popular topic." [R. 179].  He said the patients are usually females "that tend to be higher strung." [R. 179].  He opined that surgical intervention would not be of benefit and recommended a comprehensive neurology evaluation and treatment protocol for headaches before considering any surgical procedure. *Id.*

Plaintiff continued seeing Dr. Jennings who prescribed Fioricet.[9] [R. 199-207]. On November 8, 2001, Plaintiff was examined by Harvey J. Blumenthal, M.D., a neurologist. [R. 175].  He commented that Plaintiff may have some component of analgesic rebound headache with all the Fioricet she was taking but he believed the headache characteristics pointed to crowding of the foramen magnum with transient increases in spinal fluid pressure.  After reviewing the brain MRI, he recommended a suboccipital craniectomy. *Id.*

Apparently responding to a telephone call from Plaintiff, Dr. Benner wrote Plaintiff on November 13, 2001, stating he did not believe surgical intervention would be of any benefit. [R. 176].

On January 22, 2002, Plaintiff was examined by John J. Oro, M.D., at the Columbia Regional Hospital in Columbia, Missouri.[10] [R. 255-260].  He reviewed the MRI and noted "crowding at the foramen magnum, loss of the cisterna magna, and

---

[9]  Fioricet is a barbiturate, indicated for treatment of tension or muscle contraction headaches. *Physician's Desk Reference* (PDR) 53rd ed. (1999) 2028.

[10]  Dr. Oro is listed on the National Institute of Neurological Disorders and Stroke website as a neurosurgery researcher specializing in Chiari I Malformation, formerly Chief of Neurosurgery for the University of Missouri, currently the Medical Director for the Neurosurgery Center of Colorado. http://www.ninds.nih.gov/disorders/chiari/chiari.htm.

herniation of the tonsils 6 mm below the foramen magnum" as well as straightening of the cervical curvature." [R. 259]. Because he was concerned about the "briskness of her knee jerks," he ordered a thoracic MRI to determine the possibility of thoracic syrinx. *Id.* The MRI results were unremarkable. [R. 181]. Posterior fossa and cervical I decompression with duraplasty surgery was performed April 15, 2002. [R. 251-254]. On July 2, 2002, Dr. Oro reported to Dr. Jennings that follow-up examination revealed good improvement to date, gait was steady but tandem gait was slightly unsteady and Romberg improved. [R. 249]. The follow-up MRI showed excellent decompression of the foramen magnum. *Id.* Dr. Oro had a discussion with Plaintiff about developing a program to return to good overall health, including diet, sleep and a physical activity program. He encouraged her to do activities three to five times a week consisting of walking, stationary bicycle, treadmill, light weights, swimming or other activity of her choice and to steadily increase the activity. [R. 249]. He suggested returning to work in approximately a week and a half, half days for two weeks and then increasing as tolerated. He indicated Plaintiff "has an opportunity for continued improvement over this next year or so." [R. 250].

Plaintiff returned to Dr. Jennings for removal of the surgical staples on April 25, 2002, and continued to see Dr. Jennings through October 2002, for a variety of complaints including sinusitis, allergies, congestion and medication refills. [R. 184-193].

On October 4, 2002, Dr. Jennings faxed Plaintiff's records to Scott A. Anthony, D.O., for a pain management evaluation [R. 185].[11]

Dr. Anthony reported to Dr. Jennings on March 3, 2003, that Plaintiff had been under the care of Dr. Raymond Sorenson who performed "what sounds like numerous trigger point injections and perhaps an occipital nerve block" with minimal and transient benefit noted. [R. 268].   He diagnosed residual occipital neuralgia likely related to Arnold-Chiari repair. *Id.* Dr. Anthony recommended proceeding with occipital nerve blocks and encouraged Plaintiff to see her surgeon again. [R. 269].

Plaintiff was examined by Dr. Oro the next day. [R. 247].  He reported to Dr. Jennings that Plaintiff had some ongoing problems, in particular occipital pain on the right side of the surgical wound. *Id.*  Examination revealed decreased light touch sensation in the left hand and slight suggestion of clonus, not sustained.  His findings were persistent right occipital pain, likely related to occipital neuralgia and spasms in her lower extremities which interfere with her walking and noted Plaintiff would be seeing Dr. Scott Anthony for additional treatment of occipital neuralgia.   He recommended  an MRI scan to evaluate for any spinal lesion. *Id.*

A nerve block was performed by Dr. Anthony on March 10, 2003. [R. 267].  A right sided cervical paracervical trigger point injection in the suboccipital region was given on March 26, 2003. [R. 266].  Cervical facet joint injections were given at C1-2, right side, on April 21, 2003. [R. 264-265].  On that date, Dr. Anthony wrote to Dr. Jennings that Plaintiff's left sided symptoms were resolved and much of her right sided

_____

[11] Plaintiff filed an application for Social Security disability benefits on November 20, 2002.  She testified the insurance company paying long-term disability benefits required her to do so. [R. 218].

occipital neuralgia was also improved. [R. 262].  He suggested the occipital nerve may be inflamed and causing some of Plaintiff's ongoing symptoms. *Id.*  He approved the continuance of fentanyl lozenges, "although I've also told her that this is a medication which I would rather she be off of in the future."[12] *Id.* Because her hyperreflexia was still present, he urged recontact with Dr. Oro, saying "I would have expected it to be resolved by now." *Id.*

On May 16, 2003, Dr. Anthony reported continuing right sided neck pain with overall improvement in left side that is the direct result of the Arnold-Chiari malformation repair and recommended Botox injections and continuation of Actiq (fentanyl) medication. [R. 304].  On that same date, Dr. Anthony wrote a letter stating that Plaintiff has disabling pain causing her not to be able to attend school. [R. 303].  On June 4, 2003, he again wrote a letter stating Plaintiff has disabling pain causing her not to be able to attend work. [R. 302].[13]

In a July 7, 2003 letter, Dr. Anthony stated Plaintiff has had ongoing and chronic pain following a previous Arnold-Chiari malformation repair. [R. 301].  He said: "The right cervical paravertebral muscle is quite spastic as opposed to the left. Reduced range of motion is appreciated and the patient does have ongoing discomfort and pain." *Id.*  In subsequent letters to Dr. Jennings, Dr. Anthony recommended physical therapy addressing Plaintiff's cervical occipital pain and suggested Plaintiff return to Dr. Blumenthal regarding her headaches. [R. 299].  He continued the Actiq

---

[12]  Fentanyl (duragesic) is an opioid analgesic. *PDR*, 1418.

[13]  The remaining medical records cover the time period after June 30, 2003, the date Plaintiff was last insured.

(fentanyl) prescription "as this does provide her with a reasonable degree of improvement." *Id.* Dr. Anthony reported on September 2, 2003, that Plaintiff's condition remained unchanged. [R. 298].   Dr. Anthony requested authorization of an RS-41 Stimulator from Plaintiff's insurance company on September 24, 2003, for "decreasing pain and muscle spasms, as well as improving over-all muscle condition." [R. 297].

On October 8, 2003, Dr. Anthony filled out an "Attending Physician's Statement" for Plaintiff's insurance company marking "not changed" under the category for documenting Plaintiff's treatment progress and filling in the date: 7/30/01 for the date he placed Plaintiff on off-work status. [R. 295-296].  To the question: "Has patient been released to return to work?" he marked "No." *Id.*  In a letter to Dr. Jennings on October 14, 2003, Dr. Anthony stated the continuance of Actiq lozenges was justified at the present time and wrote:

> Today, on physical examination, she continues to have pain in the upper neck region.  This is primarily over the occipital nerve on the right side.  She continues to have discomfort present with palpation of the posterior spinal muscles at this level.  Again, I do think she has some degree of entrapment of the occipital nerve on the right side.  This is likely secondary to underlying reactive muscle spasm as well as scar tissue from her previous Arnold-Chiari surgery.  She also continues to have lower extremity hyperreflexia and approximately 4 to 5B clonus.  Otherwise her examination is unchanged.

[R. 293].  On December 9, 2003, Dr. Anthony asked that Dr. Gaede again see Plaintiff stating: "I again want his opinion regarding further directions for her." [R. 292].  Another "Attending Physician's Statement" form was filled out and signed on January 16, 2004, with essentially the same check-marks but with the added remark: "pt is unable to go to work. pt sent to Cleveland Clinic in Ohio." [R. 290-291].

The remaining medical evidence contained in the record covers treatment by Dr. Gaede, Jay K. Johnson, D.O. and Dr. Anthony for the time period from April 2004 through January 2005. [R. 29-51].  The last report appearing in the record is from Dr. Anthony on January 17, 2005, in which he reports a change in medication prompted worsening of Plaintiff's symptoms described as "violent shaking." [R. 51].

## Treating Physician Opinion

According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)); *see also* 20 C.F.R. § 416.927(d)(2).   In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." *See Watkins v. Barnhart*, 350 F.3d 1297, 2003 WL 22855009, at *2 (10th Cir. Dec. 2, 2003).   An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other substantial evidence in the record." *Id.* If the opinion is deficient in either of these respects, then it is not entitled to controlling weight. *Id.*   A treating physician's opinion may be rejected if it is brief, conclusory and unsupported by medical evidence.   However, specific, legitimate reasons for rejection of the opinion must be set forth by the ALJ.  *Frey v. Bowen,* 816 F.2d 508 (10th Cir. 1987); *Eggleston v. Bowen*, 851 F.2d 1244, 1246-7 (10th Cir. 1988) (if treating physician's progress notes contradict his opinion, it may be rejected).

12

In this case, Plaintiff asserts the ALJ violated the treating physician rule by improperly rejecting the opinion of Scott A. Anthony, D.O. [Plaintiff's brief, Dkt. 20, p. 6]. The evidence she claims the ALJ either overlooked or simply chose to ignore are two forms signed by Dr. Anthony on January 16, 2004 [R. 290-291] and October 1, 2003 [R. 295-296] respectively. Defendant responds that Dr. Anthony was not Plaintiff's treating physician in 2001 so he cannot qualify as Plaintiff's treating physician. Defendant also asserts that the forms were generated after the relevant time period. [Defendant's brief, Dkt. 21, p. 3-4]. Plaintiff points out in her reply that Dr. Anthony began treating Plaintiff in March 2003, well before her insured status expired, and that Dr. Anthony had reported in May and June 2003 that Plaintiff's pain prevented her from attending school and work. [Plaintiff's Reply, Dkt. 23, p. 1-2].

After review of the record and the ALJ's decision, the Court concludes the ALJ did not properly consider the medical evidence. In his written decision the ALJ stated that "[t]he record also does not contain any opinions from treating or examining physicians indicating that the claimant is disabled." [R. 24]. This is not correct. Dr. Gaede voiced doubt on August 11, 2001, that Plaintiff would be able to tolerate even half-days at work. [R. 173]. He reported on August 31, 2001, that Plaintiff's headaches were so severe she was unable to work. [R. 170]. On January 22, 2002, Dr. Oro noted Plaintiff's symptoms "caused a significant deterioration in the quality of her life. She states she is 'always in pain' and 'can't do very much.'"[R. 255, 259]. Dr. Anthony's letters to the insurance company contained statements that Plaintiff had "disabling pain" in May and June 2003. [R. 302, 303]. The ALJ did not mention Dr. Gaede's comments. Nor did he address any findings by Dr. Oro before his "followup

13

on July 2, 2002." [R. 18].  The ALJ ignored the May and June 2003 letters written by Dr. Anthony as well as the two Attending Physician's Statements he filled out in October and December 2003.  This is error. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir.1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215, 1219 (10th Cir.2004) ("An ALJ must evaluate every medical opinion in the record.").  Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is significantly probative." *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (further quotation omitted).

Counsel for the Commissioner offers no explanation for the ALJ's failure to address the physicians' opinions prior to June 30, 2003, the date Plaintiff was last insured.  The Commissioner's proffered explanation for the ALJ's treatment of the two latter statements is not found anywhere in the ALJ's decision.  Because the Court may not create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the decision itself, this case must be remanded for the ALJ to address on that issue. *See  Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir.2004) (That the record contains evidence that may support a specific factual finding cannot substitute for the finding itself); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir.2001) ("[W]e are not in a position to draw factual conclusions on behalf of the ALJ.").

The ALJ also appears to have adopted the opinion of a consultative medical expert in concluding that the severity of Plaintiff's symptoms is disproportionate in comparison to the usual expected severity of her condition. [R. 23].  Since this is a medical conclusion, the ALJ was required to link this finding to the medical evidence.  Although he did not identify the evidence he relied upon in reaching this determination, it appears the ALJ based this finding on the telephone testimony of Dr. Susan Blue who was called at the supplemental hearing on May 19, 2004. [R. 331-349].   The ALJ set forth Dr. Blue's testimony in great detail in his decision, repeating twice Dr. Blue's statement that "it was not common to perform surgery for Chiari malformation." [R. 21, 24].   The purpose behind the ALJ's emphasis on this portion of Dr. Blue's testimony is obscure.  Three out of four doctors who examined Plaintiff and reviewed her MRIs recommended surgery.  Dr. Oro concluded surgery was warranted and he performed the decompression procedure described in medical literature as "the only treatment available to correct functional disturbances or halt the progression of damage to the central nervous system" caused by Chiari malformation.[14]   Whether or not surgery should have been performed is irrelevant. The fact of the matter is that surgery was performed.  The issue to be resolved by the ALJ was whether or not the surgery was successful to the point that Plaintiff retained the residual functional capacity allowing her to perform the full range of sedentary work activities.

---

[14] National Institute of Neurological Disorders and Stroke, Chiari Malformation Information Page online at: http://www.ninds.nih.gov/disorders/chiari/chiari.htm

In this regard, the ALJ preferred Dr. Blue's testimony that Plaintiff's complaints of neck and head pain are "somewhat disproportionate to the findings" over the statements by physicians who examined and/or treated Plaintiff after her surgery. The rationale for this preference was not explained by the ALJ. Dr. Blue did not examine Plaintiff; her opinion was rendered based only upon her review of the medical records. However, none of Plaintiff's treating or examining physicians suggested Plaintiff was feigning her symptoms or malingering. Dr. Oro observed that Plaintiff was on disability from office work as an administrative assistant. [R. 256, 259]. When Dr. Oro recommended Plaintiff develop an activity program and suggested she attempt returning to work half days, gradually increasing activities "as tolerated," he did not definitively state Plaintiff was released to return to work. [R. 249-250]. Nor did he address Plaintiff's activity or work status eight months later, when he found persistent right occipital pain, likely related to occipital neuralgia, and spasms in her lower extremities which interfere with her walking. [R. 267]. Dr. Anthony treated Plaintiff for occipital neuralgia and related symptoms. It has long been established that opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant." *Williams,* 844 F.2d at 757; *see also* 20 C.F.R. §§§§ 404.1527(d)(1), (2) and 416.927(d)(1), (2); *see also* Soc. Sec. R. 96-6p, 1996 WL 374180, at *2.

If the ALJ concluded that Dr. Anthony failed to provide sufficient support for his conclusions about Plaintiff's disabling pain, he was required to contact the doctor for clarification of his opinion before rejecting it. *White v. Barnhart*, 287 F.3d 903, 908

16

(10th Cir.2001) (citing 20 C.F.R. § 416.912(e)); see 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 1512(f), 1519a(a)(1); *see also McGoffin,* 288 F.3d at 1252 (holding ALJ had obligation to recontact treating physician if validity of his report open to question). The ALJ did not do so.  The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all. 20 C.F.R. §§§§ 404.1527(d)(1), (2) and 416.927(1), (2); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2. Thus, the ALJ erred in rejecting the treating physician opinion of Dr. Anthony in favor of the non-examining, consulting physician opinion of Dr. Blue absent a legally sufficient explanation for doing so.

### Credibility Determination and RFC

Because the ALJ did not properly consider the medical evidence, his weighing of Plaintiff's credibility against the medical evidence is infirm.  Furthermore, the ALJ did not make specific findings regarding Plaintiff's RFC, in particular those limitations imposed by "status post posterior fossa decompression for Chiari I malformation," an impairment he determined was severe at step two. [R. 17].   The record is uncontroverted that Plaintiff suffered from multiple neurologic complaints consistent with Chiari I malformation prior to decompression surgery performed on April 15, 2002, and from occipital neuralgia and spasms in her lower extremities afterward.  In setting forth his RFC assessment, the ALJ failed to discuss the severity of limitations caused by the impairment, the effect of those limitations on Plaintiff's ability to work, or the effect of prescribed medications on her ability to work. The ALJ's failure to set forth the basis of his RFC determination is error. *See Winfrey*, 92 F.3d at 1025 ("[r]equiring the ALJ

17

to make specific findings on the record).  Where the burden is on the Commissioner at step five of the disability evaluation process to produce evidence that Plaintiff can perform other work in the national economy, and the Commissioner does not meet that burden and, thus, does not sufficiently rebut the prima facie case of disability, reversal is appropriate.

### Application of the "Grids"

Because this case is remanded for reconsideration of the medical evidence and reassessment of Plaintiff's RFC before proceeding to subsequent steps in the required evaluative sequence, Plaintiff's allegation of error regarding the ALJ's application of the Grids at step five is not addressed.

### Conclusion

The ALJ did not properly consider the medical evidence in the record and did not make specific findings regarding his assessment of Plaintiff's RFC.  Therefore, the Court cannot say that the record contains substantial evidence to support the determination of the ALJ that Plaintiff is not disabled.  Accordingly, the decision of the Commissioner finding Plaintiff not disabled is REVERSED and REMANDED for reconsideration of the medical evidence and reassessment of Plaintiff's RFC and for such further development at subsequent steps as may then be required in order to determine whether Plaintiff is disabled.

Dated this 22nd day of January, 2007.

Frank H. McCarthy

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE

18